IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION AT DAYTON

| | | |
|---|---|---|
| AMERICAN LAND INVESTMENTS, LTD. | ) ) ) | |
| Plaintiff, | ) ) | Case No.: 3:16-cv-489 |
| v. | ) ) ) | |
| ALLSTATE INSURANCE COMPANY, *et al.* | ) ) | Judge Thomas M. Rose |
| Defendants. | ) | |

**ENTRY AND ORDER GRANTING DEFENDANT ALLSTATE INSURANCE COMPANY'S MOTION FOR SUMMARY JUDGMENT (ECF 37) AND TERMINATING CASE.**

Defendants Allstate Insurance Company has moved the Court for entry of summary judgment on Plaintiff American Land Investments, Ltd.'s claims of breach of contract and lack of good faith under Ohio common law. (ECF 37)  Because the motion is well-taken, it will be granted.

I.      **FACTUAL AND PROCEDURAL HISTORY**

Plaintiff American Land Investments is in the business of residential real estate. (ECF 1-2, at PageID 8.)  Three of the commercial property units owned by American Land Investments are 221, 223, and 225 South Walnut Ave., Sidney, Ohio are interconnected buildings.  A fourth, 227 South Walnut, is a free-standing building.  Duaine Liette is the sole member of American Land Investments, Ltd. (EUO-I, p. 4.).  American Land Investments' properties were insured under a policy issued by Defendant Allstate Insurance Company.

On October 25, 2015, while the policy was in force, residential units 223, 225 and 227 were vandalized. (ECF 1-2, at PageID 8.) American Land Investments reported the loss to Allstate on October 26, 2015. Plaintiff reported that vandals spray-painted the complex's roof, consisting of some white and yellow marks, and caused other claimed damage. (EUO-II, p. 179-200, and Exhibits 39-44, 49.) After investigating the matter, Allstate paid half of the claim to American Land Investments. (*Id.*) (The other half was paid to unserved Co-Defendant Minster Bank.)

The property was again vandalized on or about November 19, 2015, and American Land Investments reported another insurance claim. (*Id.*) Plaintiff reported to Allstate that vandals forcibly entered the premises and cut interior loadbearing columns and beams supporting the roof inside the structure within 221 South Walnut with a saw. (ECF 5, Complaint, Par. 10; EUO-II, p. 219.) Allstate began a second investigation into the matter and has yet to issue a claims decision. (*Id.*). The policy provides that "any suit of claim for loss must be brought within one year after the loss or damage occurs." (ECF 1-2, at PageID 8.)

On October 20, 2016, American Land Investments filed three causes of action in the Shelby County Court of Common Pleas. (*Id.*) The first cause of action alleged that Allstate breached the insurance contract by failing to pay the amount due under the policy for both claims; the second cause of action alleged that Allstate lacked good faith in its handling of both claims; and the third cause of action sought declaratory judgment as to how Allstate should disburse payments. (*Id.*)

Plaintiff's Complaint against Allstate asserts causes of action for breach of contract and bad faith. (ECF 5, Complaint, First Cause of Action, Par. 14-19; Second Cause of Action, Par. 20-25.) Specifically, Plaintiff alleges that Allstate only paid "half" of Plaintiff's claim arising

from the reported October 26, 2015 spray painting loss. (ECF 5, Complaint, Par. 9.) As to the November 19, 2015 structural vandalism claim, Plaintiff alleges that it cooperated with Allstate and submitted the necessary proofs of loss, but that Allstate had, to that date, failed to issue a claim decision, necessitating that Plaintiff file suit. (ECF 5, Par. 11-13.) Plaintiff's Complaint further seeks a declaratory judgment declaring that the alleged vandalism losses are covered under the Allstate Policy. (ECF 5, Complaint, Third Cause of Action, Par. 29.)

In addition to the foregoing, the Complaint named Plaintiff's mortgagee, Minster Bank, as an additional defendant, on the theory that Plaintiff was entitled to a judgment declaring that Allstate was obligated to pay Minster regardless of Allstate's decision with respect to the payment of Plaintiff's claims. (ECF 5, Complaint, Third Cause of Action, Par. 29.)

On November 21, 2016, Allstate removed the case to this Court based on diversity jurisdiction pursuant to 28 U.S.C. § 1332. (ECF 1, at PageID 1.)

On November 21, 2016, Allstate filed its Notice of Removal to federal court, based on diversity jurisdiction, pursuant to 28 U.S.C. §§ 1332, 1441, and 1446. (ECF 1, Notice of Removal.) On that same date, Allstate filed its Answer, denying the essential allegations of Plaintiff's Complaint. (ECF 2, Allstate's Answer.) As to Plaintiff's allegations against Allstate, Allstate raised affirmative defenses including: (1) Plaintiff, through its principal, or someone acting at their direction, intentionally vandalized Plaintiff's own property, and, therefore, Plaintiff's claims were barred by the terms and conditions of the Allstate Policy (ECF 2, Allstate's Answer, Affirmative Defenses, Par. 6); (2) the reported vandalism losses did not occur as Plaintiff claimed, and were not sudden and accidental losses, and, therefore, were not covered losses under the policy (ECF 2, Allstate's Answer, Affirmative Defenses, Par. 7); and (3) Plaintiff, through Liette, concealed and misrepresented material facts relating to the claims, and,

therefore, the Allstate Policy was void, and Plaintiff's claims thus were barred by the terms and conditions of the Policy (ECF 2, Allstate's Answer, Affirmative Defenses, Par. 1, 8, 10, 11).

On August 25, 2017, Allstate formally advised Plaintiff that it was denying Plaintiff's claim arising from the reported October 26, 2015 spray painting loss. (See, Exhibit A, Denial Letter for Date of Loss October 26, 2015.) Allstate's letter cited Plaintiff to the pertinent terms and conditions of Plaintiff's Allstate Policy, and advised Plaintiff that Allstate was denying Plaintiff's claim because the same or similar spray painting condition already existed on the roof from a prior claimed act of vandalism that had remained unrestored; and Liette intentionally concealed or misrepresented material facts relating to Plaintiff's claim, and the policy was void.

That same day, Allstate also formally advised Plaintiff that it was denying Plaintiff's claim arising from the reported November 19, 2015 structural vandalism loss. (See, Exhibit B, Denial Letter for Date of Loss November 19, 2015.) Allstate's letter again cited Plaintiff to the pertinent terms and conditions of Plaintiff's Allstate Policy, and advised Plaintiff that Allstate was denying Plaintiff's claim because the cutting of the structural columns occurred three to four weeks prior to the reported loss date of November 19, 2015, and was done by Liette, or someone acting at his request, as Liette was the only person who had access to the property during that period, and, thus, the claimed damages were excluded under the Policy's "Dishonest or Criminal Act" exclusion; alternatively because the claimed vandalism loss did not occur as reported, it was not a sudden and accidental loss, and, therefore was not a covered loss under the policy; additionally, because Liette intentionally concealed or misrepresented material facts relating to Plaintiff's claim, coverage was void pursuant to the Policy's "Concealment, Misrepresentation or Fraud" provision.

Allstate contends that Plaintiff, through Liette, concealed or misrepresented material facts relating to Plaintiff's claims, and so Allstate was reasonably justified in denying Plaintiff's claims pursuant to the Policy's "Concealment, Misrepresentation or Fraud" provision. Allstate contends it did not breach Plaintiff's Allstate Policy, nor act in bad faith, and, thus, is entitled to judgment on all of Plaintiff's causes of action as a matter of law.

Allstate's motion for summary judgement is based largely on Liette's actions during the investigation and what Allstate learned through the investigation. Allstate questioned Liette about business tenants at the commercial premises, for the purpose of identifying possible witnesses who may have knowledge about the reported vandalism losses, or information helpful to the investigation of the reported losses – such as who may have been in the building at the time of the reported losses, and who had access to the building. (See, e.g., EUO-I, at 127, 147-148, 152.) Liette identified Mary Layman as the only "business tenant" in the building at the time of the reported losses. (EUO-1, p. 82, 141, 151-152.)

Liette testified that he was told Layman and her daughter-in-law were "working that night in her storefront unit" at 223 South Walnut, when around midnight, they heard a noise at the back door of 221 South Walnut. (EUO-I, p. 159-160.) Layman called the police. (See, EUO-II, Exhibit 59, police report.) Liette testified he "understood" that Layman subsequently tried to call him, and after failing to reach him, then called Liette's wife, who then contacted Liette. (See, EUO-II, p. 161-162.)

On December 7, 2015, months before Liette's Examination Under Oath, Allstate's investigator obtained a recorded statement from Layman in which she confirmed that she had been residing at 223 South Walnut at the time of the reported losses: "*** There's a little

apartment in there I stay in, yes." (See, Exhibit C, Transcript of Recorded Statement of Mary Layman December 7, 2015, p. 4.)

During Liette's first examination under oath, Liette was asked if Layman was living in 223 South Walnut. Liette responded: "Not that I know of. I don't know if she does. I don't know. I don't know if she stays there or not." (ECF 42, PageID 938, EUO-I, p. 160.) During Liette's second examination under oath, Liette was again asked questions about whether Layman was living there, or if anybody had ever told him she was living there. Liette testified: "No, nobody told me she was living there. I don't know anything about her living there. If she was living there or if she wasn't living there, I have no idea. The only thing I know is I leased her the building at that date. I never got involved with it." (ECF 37-12, PageID 710, EUO-II, p. 153-154.)

Allstate obtained inspection reports and related records from the Sidney-Shelby County Health Department, Sidney Fire Department, and Sidney Police Department, concerning various violations and conditions at the property. The records document that Layman was living at 223 South Walnut. (EUO-II, p. 154-159, and Exhibits 32-36.) Liette acknowledged receiving the health department letters (EUO-II, p. 154, 156, 157), but denied the letters served as notice to him that someone was living there. (EUO-II, p. 154-155.) Liette acknowledged only that, on one occasion, Layman told him that, at times when she was there working late, she "had laid down there when she was tired." Liette testified he had told Layman that she could not stay there. (EUO-II, p. 155-156.) However, Liette claimed to have never actually seen Layman sleeping inside the building, and that he "ha[d] no idea where she lived at." (EUO-II, p. 154-155.) Liette testified that Layman could have been living there, but, he never asked, and he did not know. (EUO-II, p. 165.) Liette testified: "I didn't let her stay there." (EUO-II, p. 156.)

Month prior to the spray-painting claim reported to Allstate, on June 8, 2015, the Sidney Police Department investigated the death of Layman's husband, Gerald Layman. The certificate of death documents that Layman died at the Laymans' home at 223 South Walnut. (EUO-II, p. 167-168 Exhibit 37) Liette acknowledged that Layman died on his commercial property; however, Liette again denied any knowledge that Layman was living at his commercial property at 223 South Walnut: "I never asked, never even got into it with them [Laymans] at all except telling them they cannot live there. That's all I know." (EUO-II, p. 167.)

Liette's wife, who performed bookkeeping functions for Plaintiff, testified that if the notices were sent by the Sidney Fire Department, she would have received them and she would have given them to her husband. (Angela Liette Depo p. 44).

Lieutenant Kittle of the Sidney Fire & Emergency Services Fire Prevention Division, performed the inspections of Plaintiff's property. Kittle has reaffirmed the truth and accuracy of his written reports and correspondence, regarding the violations he found at the property, including the fact that Layman was living there illegally. Further, Kittle attested that he personally advised Liette of the violations, contrary to Liette's sworn testimony. (See, Exhibit D, Affidavit of Brett A. Kittle.) Rusty Schwepe, Registered Sanitarian with the Board of Health, Sidney-Shelby County, has also reaffirmed the truth of this information, as documented in the written health department notices served on Liette. (See, Exhibit E, Affidavit of Rusty Schwepe.)

On May 7, 2018, Layman confirmed her January 30, 2017 recorded statement to Allstate's investigator, that between September and December 2012, Liette knew she was living there. (Deposition of Mary Layman ("Layman Dep."), p. 19.) Layman testified she lived there continuously through 2015. (Layman Dep. p. 19-20.) Further, Layman testified that Liette knew she was living there, and that Liette knowingly continued to let her live there: "I mean he knew

we were living there but wasn't making me move out ***." (Layman Dep. p. 56- 57.) When Plaintiff's counsel asked Layman if Liette was lying when he testified that he did not believe 223 South Walnut was her primary residence, Layman responded: "Yes, because he asked me if we were living there." (Layman Dep. p. 67.)

Allstate's investigation extended to the question of whether Liette's attempt to conceal Layman's continuous residence at the property during October and November of 2015 was material to Allstate's investigation. During his second examination under oath, Liette conceded that, if the damage to the structural support beams and posts was done by a chainsaw, someone should hear it. Liette testified that neither the neighbors, nor Layman, told him that they heard a saw of any kind. (EUO-II, p. 221-222.)

Layman testified in her deposition that she did not hear chainsaws during the evening of November 19, 2015. (Layman Dep. p. 48.) To the contrary, Layman testified that the sound of a chainsaw woke her up around 8:00 a.m. to 8:30 a.m., while she was sleeping at her residence at 223 S. Walnut, two to three weeks prior to the date of the alleged burglary of November 19, 2015, the date Liette presented to Allstate as an act of vandalism that occurred during the night of November 19, 2015. (Layman Dep. p. 48-49, 51, 65-67.) Layman testified that the sound of sawing lasted "[p]robably about an hour." (Layman Dep. p. 51.) Liette testified that he was present at his warehouse nearly every day of the week. (EUO-II, p. 202-203.)

Liette also testified concerning the multiple prior insurance claims that had been made by Plaintiff, involving the insured property. Liette testified that Plaintiff's prior insurance claims included a September 30, 2010 spray-painting vandalism claim, (nearly identical to his October 2015 claim) for which Liette acknowledged receiving "over $100,000" in insurance proceeds as compensation from his former insurer, Nationwide. (EUO-I, p. 97.) Liette testified that,

although having received over $100,000 in insurance proceeds for estimated repairs, he did not have a commercial vendor repair the roof on the structure following that claim, but instead kept the money for himself. (EUO-I, p. 100.) Liette claims he used his power washer and attempted to wash off the paint. (EUO-I, p. 98-99.)

Liette testified that he then had another spray-painting vandalism claim on July 27, 2011, involving damage to the roof, for which Liette thought Nationwide paid "[$]50,000 or more." (EUO-I, p. 102-109.) Liette testified that following the 2011 spray-painting vandalism claim, he engaged independent vendor Thomas Beaver of Eager Beaver Roofing to replace the roof. Beaver, however, allegedly "le[]t everything to go to pieces." (EUO-I, p. 20, 110.) Liette testified that Beaver failed to properly tarp the roof, which allowed rain to enter the building. (EUO-I, p. 47.) Liette testified that the rain intrusion ruined drywall and Liette's tools and materials. (EUO-I, p. 47, 49.) Liette testified that he sued Beaver, who was then insured with United Ohio; however, that lawsuit "did not go anywhere," because United Ohio took the position that the damages were the result of "faulty workmanship." (EUO-I, p. 48, 50.) Liette testified that he did not make a claim against his own insurance company for the water damage loss, stating he "didn't have insurance for that." (EUO-I, p. 49, 51.) Liette testified that he wound up doing the work himself, and that he "put a whole new roof on." (EUO-I, p. 111.)

Allstate obtained records regarding Plaintiff's 2011 claim from United Ohio and Century Insurance. The records established that, not only did Liette conceal or misrepresent to Allstate the material facts underlying this 2011 claim, but also the events surrounding the claim were in fact the subject of the 2012 lawsuit that was filed by United Ohio against Plaintiff and Liette individually, for making a fraudulent insurance claim. (See, EUO-II, p. 132-149, and Exhibits 29-30.)

Following Beaver's commencement of the roof work, Plaintiff and Liette presented a claim to United Ohio in June, 2011, for claimed water damage originating from the property's roof; then withdrew that claim on the same day Beaver applied for the subject United Ohio policy; Plaintiff and Liette thereafter had Beaver's insurance agent add American Land Investment as an additional insured on the Beaver/United Ohio policy; and, Plaintiff and Liette then filed another claim with United Ohio in July, 2011, for water damage that reportedly occurred on July 11, 2011. (See, id.)

During the investigation of his 2011 claim by United Ohio, Beaver had his Examination Under Oath conducted by United Ohio's counsel on September 22, 2011. Beaver testified he believed that Liette "was trying to get the insurance to pay for long-standing leak and mold damage," which was already preexisting within the building. (See, Exhibit F, Transcript of Examination Under Oath of Thomas Beaver, September 14, 2011, *In the Matter of: Thomas Beaver, Eager Beaver Construction and Ohio Mutual Insurance Company*, Claim No. 11-14570 ("Beaver EUO"), p. 24, 27-31, 35, 39-41, 45-46, 74, 78.) Beaver testified that Liette called him and said they had to work together in the presentation of the claim. Beaver testified that they sat in Liette's truck, and Liette said "we got to keep our stories straight you know. We got to be on the same page. You can't say one thing and me say another." (Beaver EUO, p. 77.) Liette's claim was eventually resolved by the entry of default judgment against him in the Shelby County Court of Common Pleas on March 29, 2012.

During his second examination under oath, Liette was asked questions about the condition of the roof leading up to the subject 2015 claims with Allstate. Liette initially testified that there was a "little leak" in the roof at one time, which, from what he understood, he had

fixed, and then "the same leak came back and I had to refix it again." (EUO-II, p. 19-20.) Liette testified: "There were no other leaks in the roof." (EUO-II, p. 20.)

Liette was asked whether there was any mold problem in the interior of the insured property. Liette initially testified: "I believe I seen mold on the walls – on one wall one time" in 225 S. Walnut, in or around 2010. (EUO-II, p. 21.) Liette testified that: "*** we usually just used bleach and water and cleaned it off[,]" (EUO-II, p. 22-23), and that "[w]e didn't have any more problems with it." (EUO-II, p. 130-131.) Liette also testified that "221 had some mold in it, too, at one time, too[,]" in 2013. (EUO-II, p. 131.) According to Liette, the tenants that had moved in to 225 S. Walnut in February, 2013, thereafter took care of the mold problem, and Liette testified he "didn't see it any more after that." (EUO-II, p. 131-132.)

The records obtained by Allstate from the Sydney-Shelby County Health Department and Police Department document that, contrary to Liette's sworn testimony to Allstate, there were serious health conditions present within the property going back to at least 2011, and still continuing through 2013, including a long-standing roof-leak problem, and the presence of mold. When confronted with the records concerning a prior commercial tenant's 2011 mold complaint, Liette testified that the issues were "definitely" corrected in 2011, following that complaint. (EUO-II, p. 150-152, and Exhibit 31.) However, the April 23, 2013 fire prevention inspection performed by Lt. Kittle not only found Layman living there, but also that there was mold, evidence of a long-standing roof leak, collapsed ceiling tiles, and a potential structural issue. (See, EUO-II, p. 154, and Exhibit 32.) Liette testified that the fire department advised him that there was no problem with the mold as long as that area was boarded off and no one was using it, and that he fixed the roof. (EUO-II, p. 160-161.) Liette was again asked about the condition of the roof, as of the time that Layman's husband died in June, 2015, and whether there were any

signs of leaking anywhere. Liette responded that he did not remember, but if there was, it was something "minute." (EUO-II, p. 169-170.)

Layman has since confirmed in her deposition that she observed mold inside of her own apartment as 223 S. Walnut, and what looked like a roof leak. (Layman Dep. p. 31-32.) Layman testified that she told Liette about it, and although she recalled "they" did some repairs to some parts of the roof after that, "they" did not repair all of the roof. (Layman Dep. p. 33.) The fact that there was significant, long-standing damage within the insured structure has also since been confirmed through Beaver's 2011 Examination Under Oath in the United Ohio case. (Beaver EUO, p. 24, 27-31, 35, 39-41, 45- 46.)

## II.    STANDARD OF REVIEW

The standard of review applicable to motions for summary judgment is established by Federal Rule of Civil Procedure 56 and associated case law. Rule 56 provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Alternatively, summary judgment is denied "[i]f there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Hancock v. Dodson*, 958 F.2d 1367, 1374 (6th Cir. 1992) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986)). Thus, a court must enter summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The party seeking summary judgment has the initial burden of informing the court of the basis for its motion, and identifying those portions of the

pleadings, depositions, answers to interrogatories, admissions and affidavits which it believes demonstrate the absence of a genuine issue of material fact. *Id.*, at 323. The burden then shifts to the nonmoving party who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S., at 250 (quoting Fed. R. Civ. P. 56(e)). Once the burden of production has shifted, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations. It is not sufficient to "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, (1986). Rule 56 "requires the nonmoving party to go beyond the pleadings" and present some type of evidentiary material in support of its position. *Celotex Corp.*, 477 U.S., at 324.

In determining whether a genuine issue of material fact exists, a court must assume as true the evidence of the nonmoving party and draw all reasonable inferences in the favor of that party. *Anderson*, 477 U.S., at 255. If the parties present conflicting evidence, a court may not decide which evidence to believe by determining which parties' affiants are more credible. 10A Wright & Miller, *Federal Practice and Procedure*, § 2726. Rather, a court must leave credibility determinations to the fact-finder. Id.

Both parties seek summary judgment on claims brought under Ohio law. In reviewing an Ohio claim, the Court must apply the law of Ohio, as interpreted by the Supreme Court of Ohio. *Northland Ins. Co. v. Guardsman Prods. Inc.*, 141 F.3d 612, 617 (6th Cir. 1998). Specifically, the Court must apply the substantive law of Ohio "'in accordance with the then-controlling decision of the highest court of the State.'" *Imperial Hotels Corp. v. Dore*, 257 F.3d 615, 620 (6th Cir.2001) (quoting *Pedigo v. UNUM Life Ins. Co.*, 145 F.3d 804, 808 (6th Cir.1998). Also, to the extent that the highest court in Ohio has not addressed the issue presented, this Court must anticipate how

Ohio's highest court would rule. Id. (quoting *Bailey Farms, Inc. v. NOR-AM Chem. Co.,* 27 F.3d 188, 191 (6th Cir. 1994).

Finally, in ruling on a motion for summary judgment, "[a] district court is not ... obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." *InterRoyal Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir.1989).  Thus, in determining whether a genuine issue of material fact exists on a particular issue, the court is entitled to rely upon the Rule 56 evidence specifically called to its attention by the parties.

## III.    ANALYSIS

Defendant Allstate Insurance Company asserts that its policy with Plaintiff American Land Investments is void because American Land Investments, whose sole shareholder is Duaine Liette, violated the policy's "Misrepresentation, Fraud or Concealment" provision, which reads:

> This Coverage Part is void in case of any fraud by you as it relates to this Coverage Part at any time. It is also void if you or any other insured, at any time, intentionally conceal or misrepresent a material fact concerning:
>
> 1. This Coverage Part;
> 2. The Covered Property;
> 3. Your interest in the Covered Property; or
> 4. A claim under this Coverage Part.

(Exhibit G, Excerpt of Allstate Policy's Commercial Property Conditions (Form CP 00 90 07 88), Bates Stamp p. 002947.)

"'Concealment or fraud clauses are fully enforceable under Ohio law.'" *Hague v. Allstate Property & Cas. Ins. Co*., No. 3:13 CV 2677, 2014 WL 5465841 *7 (N.D. Ohio Oct. 28, 2014) (quoting *McCurdy v. Hanover Fire & Casualty Insurance Company*, 964 F.Supp.2d 863, 869 (N.D. Ohio 2013)).  In order to void the contract due to fraud or concealment, the misrepresentation must be material. Id.  "'[A] misrepresentation will be considered material if a

reasonable insurance company, in determining its course of action, would attach importance to the fact misrepresented.'" Id. (quoting *Latimore v. State Farm Fire and Casualty, Company*, 2012 WL 3061263, at *4 (N.D. Ohio 2012) (quoting *Abon, Ltd. v. Transcon Insurance Company*, 2005 WL 1414486, *13 (Ohio App. Ct. June 16, 2005), in turn quoting *Long v. Insurance Company of North America*, 670 F.2d 930, 934 (10th Cir. 1982)). The subject of the misrepresentation "need not ultimately prove to be significant to the disposition of the claim, so long as it was reasonably relevant to the insurer's investigation at the time." Id. (citing *Abon*, 2005 WL 1414486, at *13).

While "[t]he materiality of a misrepresentation is a mixed question of law and fact that under most circumstances should be determined by the trier of fact[,]" id, citing *McCurdy*, where "there is no jury question[,]" the court may determine the issue of misrepresentation as a matter of law. *Hague*, at *8 (finding Allstate properly denied the plaintiff insured's claim because the plaintiff made material misrepresentations during the post-loss investigation, and found that Plaintiff had made material misrepresentations to Allstate as a matter of law).

Moreover,

> "The requirement that a misrepresentation be material is satisfied, in the context of an insurer's post-loss investigation, if the false statement concerns a subject relevant and germane to the insurer's investigation as it was then proceeding. Accordingly, false answers are material if they might have affected the attitude and action of insurer, and they are equally material if they may be said to have been calculated either to discourage, mislead, or deflect the company's investigation in any area that might seem to the company, at that time, a relevant or productive area to investigate. *** Since the purpose of requiring answers to questions is to protect the insurer against false claims, the materiality of false answers should be judged at time of the misrepresentation, and not at time of trial." Id., citing 6 Russ & Segalia, *Couch on Insurance* (3d Ed. 2005), § 197:16 (footnotes omitted).

*Nationwide Mut. Ins. Co. v. Skeens*, Miami App. No. 07-CA-29, 2008-Ohio-1875, 2008 WL 1759101 at ¶10 (Apr. 18, 2008).

The Court concludes that there is no genuine issue of material fact but that Liette, as the sole member of Plaintiff, American Land Investments, LLC, concealed material facts, and made material misrepresentations in his examination under oath, which "concern[ed ] subject[s] relevant and germane to [Allstate's] investigation as it was then proceeding[,]" "might have affected the attitude and action of [Allstate,]" and/or were "calculated either to discourage, mislead, or deflect [Allstate's] investigation in *** area[s] that ***, at that time, [were] relevant or productive area[s] to investigate[.]" Id.

Liette concealed from Allstate that he did not know Layman was living at the property at the time of the reported losses; concealed facts underlying the 2011 insurance claim; and concealed his knowledge of the condition of the property before he reported the structural damage claim to Allstate. These subjects were all material to Allstate's investigation of possible witnesses who may have had knowledge about the reported vandalism losses or information helpful to the investigation of the reported losses; the condition of the property as it related to the value of the claim; and whether there was a motive for the presentation of a fraudulent insurance claim. Accordingly, Allstate is entitled to summary judgment on Plaintiff's breach of contract claim as a matter of law.

Also, Allstate was reasonably justified in denying Plaintiff's claims pursuant to the "Misrepresentation, Fraud or Concealment" provision of Plaintiff's Allstate Policy, based on Plaintiff's material misrepresentations.

> "[A]n insurer has the duty to act in good faith in the handling and payment of the claims of its insured. *McCurdy*, supra, 964 F. Supp.2d at 874. An insurer fails to exercise good faith in processing an insurance claim when 'its refusal to pay the claim is not

predicated upon circumstances that furnish reasonable justification therefor.' *Corbo Properties, Ltd v. Seneca Insurance Company, Incorporated*, 771 F.Supp.2d 877, 887 (N.D. Ohio 2011) (citing *Zoppo v. Homestead Insurance Company*, 71 Ohio St.3d 552, 554, 644 N.E.2d 397, 400 (1994); *Rose v. Hartford Underwriters Insurance Company*, 203 F.3d 417, 421 (6th Cir. 2000)). Denial of a claim is not reasonably justified when it is done arbitrarily and capriciously. Id. (See *Hoskins v. Aetna Life Insurance Company*, 6 Ohio St.3d 272, 277, 452 N.E.2d 1315, 1320 (1983); *Thomas v. Allstate Insurance Company*, 974 F.2d 706, 711 (6th Cir. 1992)). However, denial of a claim may be reasonably justified when 'the claim was fairly debatable and the refusal was premised on either the status of the law at the time of the denial or the facts that gave rise to the claim.' Id. (citing *Tokles & Son v. Midwestern Indemnity Company*, 65 Ohio St.3d 621, 630, 605 N.E.2d 936, 943 (1992); *Maxey v. State Farm Fire & Casualty Company*, 689 F. Supp. 2d 946, 953 (S.D. Ohio 2010)). 'The test, therefore, is not whether the defendant's conclusion to deny benefits was correct, but whether the decision to deny benefits was arbitrary or capricious, and there existed a reasonable justification for the denial.'" Id. (citing *Thomas*, supra, 974 F.2d at 711).

*Hague*, at *8:

Allstate was reasonably justified in denying Plaintiff's claims for breach of the "Concealment or Fraud" provisions of Plaintiff's Allstate policy. Plaintiff, through Liette, concealed material facts, and made material misrepresentations in his examination under oath, which were material to Allstate's investigation. Liette had the only key to the warehouse at 221 S. Walnut (EUO-I, p. 147); and Mary Layman heard the sound of a chain saw operating in the warehouse two to three weeks prior to the date of the reported loss of November 19, 2015; and Layman did not hear the sound of chain saws on the date of the reported loss. These facts justify Allstate's conclusion that Liette was responsible for the structural damage to posts and beams of a structure with a leaking roof and mold issues that he was unable to sell for "two-plus years" before October, 2015. (EUO-II, p. 192.)

There is no evidence tending to show a lack of good faith on the part of Allstate in the handling of Plaintiff's claim.  Rather, the circumstances provided reasonable justification for Allstate's denial.  At the very least, the claim was "fairly debatable."  For these reasons, Allstate is further entitled to summary judgment on Plaintiff's bad faith claim. See, id.

**CONCLUSION**

Allstate is entitled to summary judgment on American Land Investments claim that breached the insurance contract by failing to pay two claims because the insurance contract contained a "concealment or fraud" clause that Allstate is entitled to enforce.  Allstate is entitled to summary judgment on the claim that it lacked good faith in its handling of the claims because the circumstances provided reasonable justification for Allstate's denial.  Finally, for these same reasons, Allstate is entitled to summary judgment on Plaintiff's claim for declaratory judgment as to how Allstate should disburse payments.  Thus, the Court **GRANTS** Defendant Allstate's Motion for Summary Judgment. (ECF 37).   The Clerk is **ORDERED** to enter judgment in favor of Allstate and against American Land Investments on all claims and to **TERMINATE** this case from the dockets of the United States District Court, Southern District of Ohio, Western Division at Dayton.

**DONE** and **ORDERED** in Dayton, Ohio, this Tuesday, March 19, 2019.


s/Thomas M. Rose
_____
THOMAS M. ROSE
UNITED STATES DISTRICT JUDGE